Henok ARAYA, Appellant,

v.

Aida KELETA, Appellee.

Nos. 11–FM–1105, 11–FM–1192, 11–FM–1230, 12–FM–0361, 12–FM–0408.

District of Columbia Court of Appeals.

Argued Nov. 28, 2012.

Decided March 21, 2013.

Henok Araya, pro se.

Johnny M. Riddick, Washington, for appellee.

Before GLICKMAN, THOMPSON, and McLEESE, Associate Judges.

THOMPSON, Associate Judge:

In these consolidated appeals, appellant Henok Araya (the "husband") seeks review of the Judgment and Decree of Divorce Absolute and Order of Custody and Support entered by the trial court on August 24, 2011, (the "Order" or the "divorce decree") and the court's subsequent order on attorney's fees. He makes numerous claims of error with respect to the court's child-custody determination, division of property, and awards of child support, alimony, and attorney's fees to his now ex-

wife, Aida Keleta (the "wife"). Although we address each of the issues raised, only one occasions this published opinion: whether the court erred in awarding to the wife real property that the husband brought to the marriage as his sole and separate property. On the particular facts of this case, we hold that the court did not err in making that disposition. As to that ruling, and in all other respects, we affirm the judgment of the trial court.

## I. Background

The parties married on August 20, 2004, and separated on January 15, 2009. They have three minor children, all daughters, who were ages five, three, and two on the date of the divorce decree. As found by the trial court, at the time of trial, the husband, a cosmetic surgeon, was an "entrepreneurial physician in private practice," who worked full-time, generating a "significant income from his practice and from ... numerous residential and undeveloped properties." The wife "remain[ed] with the children in the home, though [she] expect[ed] ultimately to become employed."[1]

On May 11, 2009, the husband filed a complaint in which he sought sole legal and physical custody of the children. Thereafter, he filed an amended complaint for divorce, custody, and spousal and child support. The wife filed an answer, amended answer, and counterclaim seeking the same. Trial was held over several days from July 28, 2010, until January 6, 2011. In its 44–page Order, the court (the Honorable John H. Bayly, Jr.) granted the petitions for divorce, awarded joint legal custody of the children, awarded the wife sole physical custody of the children, granted the husband visitation with the

---

1. The court found that the wife was planning to take classes in a two-year program to quali-fy as an ultrasound technician.

children, and ordered the husband to pay monthly child support in the amount of $3,128. The court also awarded the wife sole and separate ownership and possession of real properties located at 1800 New Jersey Avenue, N.W. (the "New Jersey Avenue property," which the court referred to as the parties' "marital home") and 435 S Street, N.W. (the "S Street property," which the court termed the "appurtenant dwelling"). In addition, the court awarded the wife spousal support in the amount of $6,000 per month for twenty-four months (an amount calculated to enable her to pay the mortgages on those annexed residential properties until, as contemplated by the court, she is able to complete re-training for employment).

## II. Child Custody and Visitation

The husband challenges the child custody award and visitation order on several grounds: he contends (1) that the trial court erred in finding and heavily weighting evidence that he committed intrafamily offenses in 2002 and in 2005–07, while "dismiss[ing]" the wife's violence toward him; (2) that the custody award improperly was based on speculation that he might be violent toward the children; and (3) that it

was legal error for the court to modify the custody arrangement that was ordered after a 2010 hearing on the parties' cross-petitions for civil protection orders ("CPOs"),[2] and that was continued through the court's December 2010 *pendente lite* custody order, where there was no showing of a change in circumstances. We reject these claims.[3]

In making the custody determination, the court specifically recognized the statutory "rebuttable presumption that joint custody is in the best interest of the child or children, except in instances where a judicial officer has found by a preponderance of the evidence that an intrafamily offense ... has occurred." D.C.Code § 16–914(a)(2) (2001). The court then noted that *both* parties had been " 'found to have committed intrafamily offenses,' " a circumstance the court determined necessitated a separate evaluation of each party's history of offenses, in order to "determine whether the presumption [in favor of joint custody] ha[d] been rebutted or otherwise affected." The court's Order recites that, in 2002, the husband pled guilty to and was "convicted" in Virginia of assaulting the wife (causing an injury to her eyelid);[4] that, in 2005 and 2006, the hus-

---

**2.** *See Araya v. Keleta,* 2011 WL 3610699 (D.C. 2011). The judge who issued the CPOs (the Honorable Erik P. Christian) required the husband to vacate the New Jersey Avenue and S Street properties and to pay child and spousal support. He also awarded both parties temporary custody and visitation rights.

**3.** We also reject the husband's claims that the court was biased in favor of the wife because she is Catholic and against the husband because he does not attend church, and that the court permitted religious attacks on the husband by the wife's counsel. The transcripts show that the subject of religion and church-going came up in three contexts: the court's consideration of a time for the husband's Sunday pick-up of the children; the wife's counsel's effort to impeach the husband's testimony about going to church; and opening

argument, in which the wife's counsel identified the spouses' religious differences as "a big issue between them." We discern in the record no evidence of bias and no appearance of bias that should have caused the trial judge to recuse himself *sua sponte.* (Quite the contrary, the court admonished counsel for the wife that "the matter of the religious profession of the [husband and wife] is mostly immaterial here," except to the extent that religion is the cause of "marital or family accord or discord, whether they're fighting over this, whether they're not and that sort of thing.") Nor did the husband, who raises the claim of bias for the first time on appeal, request that the judge recuse himself.

**4.** The husband faults the trial court for referring to his 2002 "conviction" for assaulting the wife, noting that (although he pled guilty

band again assaulted the wife and, during one incident, caused an injury to her earlobe that required outpatient surgery; and that, after an incident in which one of the children was scalded with hot water, the husband hit the wife "so forcefully in her stomach as to cause [her] pain and apprehension of miscarriage." The court also took notice of the 2009 physical altercation between the parties (the basis of the CPOs), during which the husband "violently assaulted [the wife] by pulling and dragging her across the threshold of the door of the home.... [and the wife] assaulted [the husband] by biting him in his torso area, perhaps to [restrain him] from taking the minor children from the New Jersey Avenue property." *Araya*, 26 A.3d at 709. The court noted in addition that the wife was convicted in May 2011 of misdemeanor destruction of property for having torn the husband's pants pocket during a physical altercation in October 2010. The court observed that while the wife's conduct was "also reprehensible," it was not "so dangerous or so likely of repetition as [the husband's] episodic assaultive behavior."

The court found that both parties "quite evidently love[ ] and care[ ] for" the children and noted that their violence "has not so far been directed at the children ... but only at each other." However, while satisfied that the wife presents "no menace of psychological or physical harm to the children," the court expressed "apprehen-sion that [the husband] may not be fully ready to forgo all force." Citing the husband's multiple "prior instances of resorting to force within the family," the court decided to "limit [his] time with the children to unsupervised visitation" and to award sole physical custody to the wife. This arrangement, the court found, would "lessen[ ] the opportunity for [the husband] to turn to violence th[r]ough fatigue, frustration, or overwork."

 Contrary to the husband's claim, the record supports the trial court's findings regarding the husband's intrafamily offenses. The husband contends that, contrary to the court's summary, there was no testimony about intrafamily violence in 2005 or 2006 (or 2007, a year the trial court did not actually mention in its Order). However, while the wife did not mention dates in connection with most of the assaultive incidents she described, she did provide details about her being pregnant and about the presence of a child or children during some of the incidents. The court would have been able to estimate (even if imprecisely) the years of the incidents (for example, the post-scalding incident, which occurred when the wife was pregnant and was in the company of the oldest daughter) by reference to the children's birth dates, about which the court heard testimony.[5] Further, the

and was required to attend anger management counseling and to donate $2,500 to a program for battered women and children), the matter was dismissed after two years of "good behavior." That ultimate disposition in no way made it inappropriate for the court to consider the 2002 assault.

5. The husband's claim that the court lacked "subject matter jurisdiction" over the intrafamily offenses that took place in Virginia or other unspecified locations is entirely irrelevant; a court need not have jurisdiction to have tried an offense in order to credit testimony about it or to take judicial notice of a conviction. Nor was the court precluded from taking notice of intrafamily offenses as to which the statute of limitations might have barred a criminal complaint. And, contrary to the husband's claim, taking judicial notice of the offenses did not amount to trying the husband a second time or exposing him to double jeopardy for the dismissed Virginia matter or the other matters. As the trial court recognized, the primary consideration in determining child-custody in divorce cases is the best interest of the children involved, which the court is to determine in part by

court did not "minimize[ ] and dismiss[ ]" the wife's "violence towards [the husband] and the kids." As already noted, the court took into account the wife's misdemeanor-destruction-of-property conviction and the incident in which she bit the husband in his torso, and it found that the wife had not been violent toward the children and had neither neglected nor endangered them. While the husband made numerous allegations to the contrary, the court did not credit his testimony. The court found "unconvincing" the husband's allegation that the wife threw one of the children into the husband's car.[6] As to his allegation that the wife "poured hot water" on one of the children, the court found that there was an "accident" that "resulted in [one of the children] being scalded by water she spilt on herself while in her mother's care." The court found that this accident did not indicate a "pattern of inattention or indifference by [the wife] to her children's safety or well-being." The court also found that if the wife experienced post-partum depression, she had "surmounted" it. That finding and the others described above were "anchored in credibility assessments derived from personal observations of the witnesses."[7] They are "beyond appellate reversal" unless they are "clearly erroneous,"[8] which they are not.[9]

Although the court repeatedly acknowledged that there was no evidence that the husband had been violent toward the children, it was concerned that it "may not be entirely compatible with [the children's] best interests" to place them with the hus-

considering evidence of intrafamily offenses. *See* D.C.Code § 16–914(a)(3)(F) (2001); *see also Wilkins v. Ferguson*, 928 A.2d 655, 670 (D.C.2007) ("[A] history of domestic abuse will always be relevant at every custody or visitation proceeding in which the abuser is involved."). The court would have been remiss had it failed to consider all the evidence presented about past intrafamily offenses between the parties.

6. The husband asserts that the court "never ruled on . . . or even considered" his motion to supplement the record with transcripts of the wife's trial on charges arising out of the alleged throwing incident. If this was error, it was harmless, because the judge who presided over that trial, the Honorable Stuart Nash, found the wife guilty only as to a charge of misdemeanor destruction of property and did not convict her of the other charged offenses of assault and attempted second-degree cruelty to a child.

7. *Kozlovska v. United States*, 30 A.3d 799, 803 (D.C.2011) (internal quotation marks omitted).

8. *Id.*

9. The husband protests that the trial judge (Judge Bayly) was unable to hear the complete trial, and in particular could not hear "crucial evidence" on two recordings played during the trial that, according to the husband, proved that the wife threw one of the children into his moving car in October 2010. What the trial judge actually said, upon listening to one of the recordings, was that he could hear the conversation and could hear voices, including "someone . . . talking to a baby," but could not quite make out what was being said and could not recognize the voices. Notably, the trial transcript reveals that there was background noise on the recordings; a portion of the recording was in the Tigrigna language; people were talking at the same time; some other people who were present in the courtroom remarked about the "speakers . . . not working" and about how difficult it was to hear the recordings; the husband's counsel ultimately said that she would not move the recording into evidence; and the court said it would consider the husband's testimony about the recording. The husband emphasizes that the transcript of the proceedings before Judge Nash shows that Judge Nash, who accepted the recordings as authentic, recognized the wife's voice on the tape. But Judge Bayly, too, specifically referred in his Order to having heard on a tape the voice of the wife "soothing her youngest daughter in a calm and affectionate manner." And, in any event, it is evident from the transcripts of the entire trial that Judge Bayly heard the testimony and statements of counsel.

band, who was already "pressuring for [the children's] success or academic accomplishments at such an early stage in their lives," and who had "already displayed his temper and violent reaction when confronted with disagreement, disappointment, or displeasure." It is clear from the Order that these facts—and not mere "speculation," as the husband asserts—informed the court's determination to ensure that the husband, who it found had "anger management difficulties," was not "placed in a position that would propel him to resort to force to impose parental direction or discipline." Moreover, the court's decision to award sole physical custody of the children to the wife was based on several other factors, including the fact that the wife had spent "considerably more time with the children in their daily routines" and was "more intimately aware of their needs, especially for continuity, closeness, and displays of affection." The court observed that the husband's attention was "directed more to promoting school attendance, planning, and enforcing schedules." The court was "skeptical that [the husband's] professional career and demanding hours would have permitted [him] the time he claims he devoted to care [for] the children in the early morning, at mid-day, and in the evening," and it "discount[ed] to a considerable extent [his] claims of providing daily care for the children," as inconsistent with his explanation of his professional work and responsibilities. Again, these were credibility-based determinations, which are "well[-]nigh unassailable." [10]

■ We will reverse a trial court's order regarding child custody only where there has been a "manifest abuse of discretion." *Jordan v. Jordan,* 14 A.3d 1136,

1146 (D.C.2011). On the record before us, we cannot conclude that the trial court manifestly abused its discretion in determining that it was in the children's best interest to award physical custody of the children to the wife. The court's findings were not "against the weight of the evidence" as credited by the court, and we discern no clear error in any of the court's findings. We also agree with the trial court that the fact that both parties had committed intra-family offenses did not mean that the offenses simply canceled each other out, necessitating an award of joint custody. Finally, the court was not precluded from making a custody determination that differed from the "50:50" custody arrangement that Judge Bayly ordered *pendente lite* and that Judge Christian ordered in granting the CPOs. In issuing the Order, Judge Bayly had a fuller record than was available to him at the time of the temporary custody order, and "[a]ny legal conclusions made in a CPO proceeding concerning a spouse's rights are not dispositive in a later divorce proceeding." *Araya v. Keleta,* 19 A.3d 358, 361 n. 4 (D.C.2011).

### III. Child Support and Alimony

■ The trial court found that the wife had no present income or assets to contribute to the support of the children [11] and needed the husband's financial assistance to support custody. The court also found that the husband had "incorrectly accounted for his ability to pay child support as well as alimony." Utilizing the husband's 2008 tax returns ("the most recent return provided to the Court"), the court imputed to him a net income of at least $283,484 (instead of his reported earned income of $100,000, his salary from his medical prac-

---

**10.** *McCraney v. United States,* 983 A.2d 1041, 1061 (D.C.2009).

**11.** The wife so testified.

tice)[12] and treated his annual income as $240,000 for purposes of computing child support (an amount that reflected an adjustment to take into account amounts the husband was spending for health insurance and a caregiver for the children).[13] The husband argues that the court arrived at the imputed income amount by erroneously adding to his income the $147,484 deduction his medical practice took for depreciation, what the court referred to as the "inexplicable" $130,966 deduction the practice took for "reference materials," and the $36,000 deduction the practice took for the cost of leasing an airplane. For that reason, the husband contends, the awards based on the imputed income amount—as already described, monthly child support amount of $3,128 (superseding the $1,029 monthly *pendente lite* amount) and "rehabilitative" alimony over the course of 24 months to enable the wife to pay the mortgages ($2,900 and $1,900 per month) on the properties awarded to her—cannot be sustained.

■ A trial court has a "considerable measure of discretion in determining the appropriate amount· of alimony and child support" based on its determination of net income. *Mumma v. Mumma*, 280 A.2d 73, 76 (D.C.1971). "That determination will not be disturbed on appeal unless the court clearly abused its discretion." *Brice v. Brice*, 411 A.2d 340, 344 (D.C.1980); *see also Leibel v. Leibel*, 190 A.2d 821, 821–22 (D.C.1963) ("The amount of alimony to be awarded ... [is] entrusted to the sound

judgment of the trial court.... [I]t is only necessary that the award have a reasonable basis in the evidence. If it has such a basis this court cannot substitute its judgment for that of the trial court."). Here, the trial court's imputation of income was for the purpose of arriving at a realistic assessment of the husband's ability to pay alimony and child support. In addition, the trial court rightly took into account the parties' ability to be self-supporting, the time necessary for the wife to gain sufficient skills to re-enter the workforce, and the comfortable standard of living that the parties enjoyed while married, i.e., "all facts and circumstances surrounding the parties." *Leibel*, 190 A.2d at 821. We are satisfied that the court's determinations as to the husband's net income and the levels of child support and alimony "were within the range of the court's permissible discretion[,] and we cannot say that the findings upon which the judgment was based were plainly wrong [or] without support in the [record evidence]." *Cefaratti v. Cefaratti*, 315 A.2d 142, 145 (D.C.1974).

■ Although the husband asserts that the court's disallowance of deductions and imputation of income were not consistent with federal income tax law, the court did not purport to make determinations about deductibility, or about whether the husband's companies were his alter ego, that would be controlling or dispositive for federal (or local) income tax purposes. Further, while the husband is correct that the child support statute describes only one circumstance (voluntary unemployment or

---

12. In deciding the "appropriate amount of alimony and child support, ... it is essential that in exercising such discretion the trial court first determine the net income (or a reasonable approximation of such) from which a portion is to be set aside for alimony and support payments, as these items are recurring expenditures." *Mumma v. Mumma*, 280 A.2d 73, 76 (D.C.1971).

13. The court found that the husband's incorporated medical practice had a gross income of $981,336 in 2008 and that the husband's rental income from his several residential properties was $333,215 in the same year. It was clear from the testimony that the husband's capacity to pay came from sources in addition to his salary; for example, he testified, "The real estate company that I own pays the mortgage at 435 S Street[.]"

underemployment) in which a trial court may impute income to a parent,[14] we have interpreted the statute as affording the trial court discretion to impute income in other circumstances as well, where appropriate to arrive at a realistic estimate of a parent's ability to pay. *Cf. Lasche v. Levin,* 977 A.2d 361, 372 (D.C.2009) (agreeing that if a parent places an inheritance in non-income producing assets, the trial court may consider as income, for purposes of child support, the amount the inheritance could have earned if it had been invested in income-producing assets). And, while the trial court acknowledged that its calculations were not done with "accounting accuracy," that degree of accuracy was not required. *Grasty v. Grasty,* 302 A.2d 218, 220 (D.C.1973).

Finally, there is no merit to the husband's contention that principles of *res judicata* and collateral estoppel applied to bar Judge Bayly from fashioning a child support award that differed from the child support amount ordered on August 19, 2009, in connection with the CPOs. The previous order (which, we note, was entered before the parties' third child was born—in itself, a substantial and material change in circumstances of the type the husband claims was lacking) was to be in effect for only up to a year. *See* D.C.Code § 16–1005(d) (2001). In addition, just as with respect to the custody award, "[a]ny legal conclusions made in a CPO proceeding concerning a spouse's rights are not dispositive in a later divorce proceeding." *Araya,* 19 A.3d at 361 n. 4.

## IV. Distribution of Property

It was undisputed at trial that the husband acquired the New Jersey Avenue property before the parties' marriage, and that he acquired the adjoining S Street property, which he titled in his name only, during the marriage. The houses on the New Jersey Avenue and S Street properties shared a common wall, and, as the husband testified at trial and asserts in his brief, he created in the common wall an opening that "annexed" the properties and "eased the moving about both properties." The wife testified that after purchasing the "shell" S Street property, the husband retained the façade but had the rest of the house razed and built a new structure from the ground up. The wife further testified that the S Street house was rebuilt without a kitchen, because it was "supposed to be part of the New Jersey Avenue house." The wife referred to the two structures together as the "houses where [the children] are used to," and where she wanted to continue to raise them.

The trial court acknowledged that the husband "indisputably acquired the house at 1800 New Jersey Avenue before the parties' marriage" (but noted that, at the time of trial, the property was encumbered by a $440,000 first trust). Regarding the S Street property, the court found that the husband failed to establish "by a preponderance of proof" that the house was acquired using proceeds from the sale of property the husband owned before the parties' marriage. The court noted that "[r]eal estate acquired following marriage is … marital property which must be equitably distributed upon a final decree of divorce, regardless of whether that property is titled jointly or individually or by the parties in another form" (internal quo-

14. *See* D.C.Code § 16–916.01(d)(10) (2001) ("If the judicial officer finds that a parent is voluntarily unemployed or underemployed as a result of the parent's bad faith or deliberate effort to suppress income, to avoid or minimize the parent's child support obligation, or to maximize the other parent's obligation, the judicial officer may impute income to this parent and calculate the child support obligation based on the imputed income.").

tation marks omitted). It also recognized that " '[s]ole and separate property acquired prior to the marriage' is to be assigned to each party." [15] It reasoned, however, that "[w]hen ... subsequently acquired real property is merged with ... earlier acquired property, as occurred here, the new entity is distributable under [D.C.Code § 16–910(b) ]."

The court found that in this case, the husband had "joined the two properties in such a fashion as to create an enlarged single dwelling that lost its separate status as [the husband's] 'sole and separate property acquired prior to the marriage.' " It concluded that "[on] account of the 'commingling' of separate real estate and marital real estate, ... the resulting edifice bec[ame] marital property as, conjoined and merged[.]" Further, the court reasoned, "[m]erger ... must have been [the husband's] purpose and intent[,]" because he "all but razed the latterly acquired S Street dwelling ... and constructed a new masonry building purposely connected with 1800 New Jersey Avenue by an interior archway opened through a party wall." The court found it "[s]ignificant[ ]" that "the reconstruction of 435 S Street was limited to bedrooms (or their equivalent) and contained no kitchen," a configuration that in the court's assessment "sharply indicates its use as an extension or enlargement of 1800 New Jersey Avenue."

In short, the court found, "the two adjoining sites coalesced into one parcel of marital real estate." The court awarded the combined parcel to the wife, expecting that it would serve as a home for her and the three children. The court awarded eleven other parcels of real property acquired during the parties' marriage (constituting all of the other marital real property in the District of Columbia) to the husband as his sole and separate property.

The court explained that the distribution it ordered was "likewise meant to recognize [the wife's] significant contributions as a homemaker" and as the primary caretaker for the children, and, for a while, her contributions in cleaning and arranging the husband's medical office as "a kind of limited joint venture[ ] in the start-up of [the husband's] surgical practice." The court found that the wife had "contributed substantially to the marriage" by bearing and raising the children and freeing the husband to build his practice and pursue his business ventures, and that the parties had "contributed equally to the family unit."

The husband contends that both the S Street property and the New Jersey Avenue property are his sole and separate properties and that the trial court erred as a matter of law in determining that the two properties were subject to distribution under § 16–910(b). The court was statutorily precluded from awarding legal title to the S Street property to the wife, he argues, because that property was acquired in exchange for the proceeds of property

---

**15.** *See* D.C.Code § 16–910(a) (2001). In relevant part, § 16–910 provides that upon entry of a final decree of divorce, the trial court shall:

> (a) assign to each party his or her sole and separate property acquired prior to the marriage ..., and his or her sole and separate property acquired during the marriage ... by gift, bequest, devise, or descent, and any increase thereof, or property acquired in exchange therefor; and

> (b) value and distribute all other property and debt accumulated during the marriage ... that has not been addressed in a valid antenuptial or postnuptial agreement ..., regardless of whether title is held individually or by the parties in a form of joint tenancy or tenancy by the entireties, in a manner that is equitable, just, and reasonable, after considering all relevant factors, including, but not limited to [enumerated factors].

he acquired before the marriage.[16] It was error to award the New Jersey Avenue property to the wife, he asserts, because that property was his sole and separate property acquired prior to the marriage and likewise was not subject to distribution. The husband also cites the lack of evidence that the wife made a financial contribution to the purchase or appreciation of the properties. He asserts that, having failed to ascertain the monetary value of the wife's contribution to the properties as a homemaker, the court made no determination (and had no basis for determining) that the wife made a "substantial contribution" to the properties that could have entitled her to even an equitable interest in the properties. We address each of these arguments below.[17]

*Whether the wife's contributions to the marriage justified the property distribution*

If the S Street and New Jersey Avenue properties were the husband's sole and separate properties but the court had found that the wife made "substantial contributions to the home" [18] or "a substantial

16. We note tangentially that there is no merit to the husband's claim that the court's finding that he razed the S Street property and connected the two properties without a permit deprived him of due process and of his rights under the Sixth Amendment. The court mentioned the apparent lack of a permit (about which the wife testified) only as a "plausible explanation" of why the Office of Tax and Revenue had not combined the lots into a single lot for tax purposes.

17. The husband additionally contends that the court erred factually in concluding that the two properties had been combined into a single property. At trial, he presented testimony from an appraiser who told the court that the two properties have separate lot and square numbers and have not been merged or combined for taxation purposes, and that he appraised them separately. In his brief to this court, the husband also emphasizes that the two properties have separate deeds, mortgages, addresses, utility meters, tax bills, and entrances. He notes the ease with which a partition was erected between the properties pursuant to the court's October 27, 2010, Order and the court's reference in that Order to the New Jersey Avenue property as the wife's residence and the S Street property as the husband's residence.

We see no reason why any of these factors requires us to reverse the property distribution portion of the Order, as nothing in the Order requires cancellation, reformation, or other disturbance of the separate deeds, mortgages, meters, tax bills, or entrances. As to the ease of partitioning, it pales in significance in comparison to the fact that separate disposition of the properties would leave the

S Street "house" without a kitchen. Finally, we note that, in other contexts, courts have ruled that where separately titled properties are used as a single unit, it may be proper for the disposition of one to govern the disposition of the other. *See, e.g., United States v. 9844 S. Titan Court*, 865 F.Supp. 709, 716 (D.Colo.1994) (holding, in a criminal forfeiture proceeding, that although condominium units had separate titles and legal descriptions, the owner had removed the common wall that separated them and had used them in his business as "one whole tract" rather than as individual units, making both subject to forfeiture even though the evidence of illegal activity (cocaine) was found in only one of the units), *rev'd on other grounds*, 75 F.3d 1470 (10th Cir.1996).

As for the references in the court's October 26, 2010, Order, that order reflected a proffer by counsel about the parties' sleeping arrangements during the period after the husband filed for custody and divorce. (The husband's counsel told the court that the husband was sleeping in the S Street property so that he could take the children to their schools, which were near the place where the husband was then living.) That *pendente lite* order, which by definition was "temporary in nature," *Foley v. Foley*, 336 A.2d 549, 551 (D.C.1975), did not purport to reach conclusions about the parties' interests in the two properties or about whether either or both properties were marital property, and it did not tie the court's hands with respect to the final disposition of the properties.

18. *Bansda v. Wheeler*, 995 A.2d 189, 199–200 (D.C.2010) ("The only way for a nontitled spouse to establish ... equitable interest [in a

contribution to the acquisition (or increase in value) of the property during the marriage,"[19] the court would have had the authority to award the wife an equitable interest in the properties (an interest the husband could have satisfied by, at his option, either selling the properties and paying the wife a share of the proceeds, or by retaining the properties and paying the wife for her equitable interest from some other funding source). What the court could not have done in those circumstances was award the wife legal title to or a legal interest in the properties (which would have permitted her to own the property outright or to force a sale).[20] Accordingly, we agree with the husband that if the S Street and New Jersey Avenue properties were the husband's sole and separate properties, the rationale the court described as the additional reasons for the property distribution it ordered (i.e., that

the distribution was "likewise meant to recognize" the wife's significant contributions to the family unit) would not have justified the award of legal title to the wife. However, as we go on to explain, we conclude that the court did not err in concluding that neither of the two properties was the husband's sole and separate property at the time of the divorce action. *Whether the S Street property was subject to distribution under § 16–910(b)*

■■■ The husband contends that the funds used to purchase the S Street property were traceable to the proceeds of his sale of an Alexandria, Virginia property he owned prior to the marriage (which funds, he claims, he deposited into a checking account and used to obtain a cashier's check for the purchase). Therefore, he contends, the S Street property was essentially "acquired in exchange for" "separate property acquired prior to the marriage"

---

home that is the other spouse's separate property] is by showing that she made substantial contributions to the home."); *see also Brice v. Brice*, 411 A.2d 340, 343 (D.C.1980) (assuming, but not deciding, that "disproportionately high payments for home maintenance and household expenses by one spouse may create an equitable interest in real property acquired prior to the marriage and held in the name of the other spouse"). Our case law suggests that "homemaker contributions," such as "cleaning, cooking, conducting daily chores, and providing home maintenance and repair" may suffice as the substantial contributions to the home that will entitle a spouse to an equitable interest in the other spouse's separate property. (*See Bansda*, 995 A.2d at 200. However, "we have not squarely decided whether ... intangible contributions alone can create an equitable interest in real property." *Araya*, 19 A.3d at 360 n. 2).

**19.** *Ealey v. Ealey*, 596 A.2d 43, 48 (D.C.1991) ("Sole and separate property under D.C.Code § 16–910(a) is ... subject to being encumbered by an equitable lien in favor of the non-purchasing spouse upon a finding by the trial judge that the non-purchasing spouse has made a substantial contribution to the acqui-

sition (or increase in value) of the property during the marriage."); *see also Yeldell v. Yeldell*, 551 A.2d 832, 834 (D.C.1988) ("The husband's payment of the monthly mortgage obligation during the marriage was a substantial contribution that created such an equitable interest.").

**20.** *See Sanders v. Sanders*, 602 A.2d 663, 666 (D.C.1992) ("[A] home purchased prior to a marriage remains the sole and separate property of the purchaser, regardless of contributions from the non-purchasing spouse during the course of the marriage."); *Yeldell*, 551 A.2d at 833, 834, 835 (agreeing, in case in which "Mr. Yeldell made most of the mortgage payments during the marriage, ... but Mrs. Yeldell had owned the house since ... long before she was married[,]" that the "husband's substantial contributions, in the form of the mortgage payments, gave him an equitable interest in the house which must be taken into account," but also holding that "the house is and must remain the sole and separate property of the wife" and that the trial court erred and "went one step too far" in awarding the husband "a ... share of the legal title," i.e., "part-ownership of the house itself").

and thus was assignable to him under D.C.Code § 16–910(a). As recounted above, however, the trial court stated that it did not find that the husband had "established by a preponderance of proof that 435 S Street was bought by proceeds from sale of property individually acquired before marriage by [the husband]."[21] The court also found that the S Street property was encumbered by a $277,000 first trust. In addition, the court relied on the wife's testimony that, after razing the original S Street house, the husband paid cash (in the neighborhood of $100,000 to $150,000) to two individuals to build a "completely new house." The court found that the money the husband used to rebuild S Street was "not convincingly traced to funds from a pre-marital acquisition of property," and it specifically did "not credit [the husband's] evidence that separate non-marital funds were the source of payment for rebuilding, reconfiguring, and merging 435 S Street." Because the court's finding that the S Street property was acquired with marital funds was founded on credibility determinations and on a reasonable inference from the credited evidence, we cannot say that the court erred in finding that the property was marital rather than the husband's separate property.

■ As marital property, the S Street property was subject to equitable distribution between the parties, a distribution that permitted the court to take into account factors including "each party's con-

tribution as a homemaker or [otherwise] to the family unit." *Ealey v. Ealey,* 596 A.2d 43, 47–48 (D.C.1991) (quoting D.C.Code § 16–910(b)(7)). Because the court found that the wife "contributed substantially to the marriage" by bearing and raising the children and freeing the husband to build his practice and pursue his business ventures, and because the court distributed most of the other marital realty (eleven parcels) to the husband, we cannot say that the court abused its discretion in awarding the S Street property to the wife.

*Whether the New Jersey Avenue property was separate property that was not subject to distribution as a marital asset*

This court generally has applied the so-called "inception of title approach," *Ealey,* 596 A.2d at 47, articulated as the principle that "property acquired prior to the marriage is the sole and separate property of the spouse who originally owned it and must be assigned to that spouse upon divorce."[22] *Yeldell v. Yeldell,* 551 A.2d 832, 834 (D.C.1988) (internal quotation marks omitted); *see also Ealey,* 596 A.2d at 47 ("Property acquired prior to the marriage remains the separate and sole property of the acquiring spouse. . . ."). Nevertheless, despite these broad statements, we have recognized that property may be changed or transformed such that it loses its character as "property acquired prior to the marriage." In *Darling v. Darling,* 444

---

21. The husband provided documentation purporting to show that he obtained the cashier's check for $18,266.85 (dated May 11, 2006) used to pay the deposit on the S Street property by debiting the same bank account into which he had deposited the proceeds of the sale of the Alexandria property ($110,209.17) in March 2006. However, the documents show another large deposit into the same bank account (a deposit of $54,604.49) on May 4, 2006. Thus, the documents do not show that the funds used to purchase the S

Street property are traceable to the proceeds of the sale of the Alexandria property.

22.· *See also* Mark London and Barbara K. Dougherty, *The Marital/Separate Property Distinction in the District of Columbia—Revisited,* 37 Cath. U.L.Rev. 645, 649 (1988) ("Under the inception of title rule, property purchased or received before marriage is separate property and retains its classification despite post-marriage enhancements and appreciation.").

A.2d 20, 24 (D.C.1982), we affirmed the trial court's award of "a 25% undivided interest in [Mr. Darling's business,] M. Darling Ltd., to [Mrs. Darling]," on the ground that her contributions to the company "were substantial enough to accomplish ... a transformation" of the company. *Ealey*, 596 A.2d at 50 n. 14. The record in *Darling* established that Mrs. Darling's "contributions were ... instrumental in transforming the business from a furnishings and interior design enterprise to an antiques dealership," *Darling*, 444 A.2d at 24, leading us to conclude that the contributions "also changed the business from an asset which began as the sole and separate property of [Mr. Darling] to one in which both parties possessed valid [legal] interests."[23] *Id.; see also Yeldell*, 551 A.2d at 835 (referring to the "clear line drawn by the legislature between property acquired prior to the marriage ... and property accumulated during the marriage," but endorsing the holding in *Darling* that the "character" of an asset owned by one spouse before the marriage may be changed, making the asset subject to distribution as marital property).

We note that the holding in *Darling* is consistent with the language of D.C.Code § 16–910(a), which does not declare that property acquired before the marriage invariably and unalterably is sole and separate (but instead denotes that if property is "sole and separate property acquired prior to the marriage," it is to be assigned to the owner and excluded from the property that is subject to distribution under § 16–910(b)). Further, recognizing that transformation of an asset held prior to marriage may render the asset distributable under § 16–910(b) is consistent with the "logic" of the statutory rule (i.e., the rule exempting a spouse's sole and separate property from the court's broad apportionment authority), which we have identified as "there normally [being] little basis for an objectively reasonable expectation of an interest in that property on the part of the other spouse." *Hemily v. Hemily*, 403 A.2d 1139, 1142–43 (D.C.1979) (envisioning, but not answering the question whether, "under the particular circumstances of a given marriage," a "property which originally was acquired ... in one of the ways enumerated in § 16–910(a) could ever ... come to be considered property subject to distribution under § 16–910(b)," *id.* at 1143 n. 3).

In this case, the trial court relied on *Darling* in ruling that the New Jersey Avenue property lost its status as the husband's sole and separate property. The issue we now confront is whether (and how) the holding in *Darling*, which involved the transformation of an ongoing business enterprise through the non-owner spouse's efforts, applies to a different type of transformation and a different type of property. We recognize that the language in some of our previous cases may suggest that real property is not amenable to a *Darling*-type analysis. *See, e.g., Sanders,*

---

23. We reasoned that the sole proprietorship the husband ran before the couple married "did not operate primarily as an antiques dealership until sometime after the marriage of the parties," and that the antiques business "represented the culmination of extensive efforts by both husband and wife and constituted an asset which came into existence during their marriage." *Darling*, 444 A.2d at 24 (alterations omitted). Notably, although we concluded that Mrs. Darling's efforts gave her an equitable interest in the business ("[w]e also find that the wife's substantial contributions operated to create in her an equitable interest in the business," *id.* at 24), this conclusion was *in addition* to our holding that Mrs. Darling acquired a legal interest in the business ("[t]he business thus became, through her efforts in the course of the marriage, an asset subject to distribution by the court under § 16–910(b)"). *Id.*

602 A.2d at 666 ("[A] home purchased prior to a marriage remains the sole and separate property of the purchaser[.]"). However, such language begs the question of whether a house purchased prior to a marriage may be so transformed that it can no longer fairly be characterized as a "home purchased prior to [the] marriage."

We turn for guidance to case law from other jurisdictions, as we have done in the past.[24] Cases from other jurisdictions provide useful examples of how a *Darling*-type rule has been applied to property other than businesses. In *Price v. Price*, 4 Va.App. 224, 355 S.E.2d 905 (1987), for example, the court held that where, during the parties' marriage, a "new" ring was created by remounting stones from a ring given to the wife prior to the parties' marriage and another ring the wife acquired during the marriage, the entire ring was marital property. *See id.* at 911–12.[25] The court applied the rule that "[w]hen separate property is combined or commingled with marital property ... the separate property loses its character as separate property and the 'new' property created [through "transmutation"] is marital." *Id.* at 912. In *Agent v. Agent*, 604 P.2d 862 (Okla.Ct.App.1979), the court held that where one spouse used money he had received as an inheritance to build a swimming pool on marital property for the benefit of the family, the inherited property, which had "undisputedly become part of the purchase price of the residence of the parties," was "so blended with the [marital] property as to lose its character as 'separate' property." *Id.* at 866.[26] We also note that courts in at least one jurisdiction (Mississippi) have held repeatedly that although marital property generally excludes assets "attributable to one of the parties' separate estates prior to the marriage," separate property may become marital property through "family use." *Rhodes v. Rhodes*, 52 So.3d 430, 436–38 (Miss.Ct.App.2011) (stating that the "family-use doctrine" "will almost always apply to the family home," and reasoning, with respect to a Florida vacation home that the husband purchased three years before the parties' marriage, that where the wife and her daughter used the vacation home substantially during the marriage and lived there after Hurricane Katrina and the wife had played an active role in improving and maintaining the vacation home during the marriage, the doctrine applied to make the house part of the marital estate).[27]

24. *See, e.g., Yeldell*, 551 A.2d at 835 (citing case law from Missouri and Illinois in support of the principles that mortgage payments made with money that is marital property do not affect the status of a house as the separate property of the spouse who owned the house before the marriage, and that separate property may become marital property when there is significant commingling of marital assets and the separate property).

25. *But cf. Fowlkes v. Fowlkes*, 42 Va.App. 1, 590 S.E.2d 53, 56, 57 (2003) (holding that where wife owned house prior to the parties' marriage, parties contributed separate rather than marital funds to build an addition to the house and "continued to treat the separate property as separate property," and wife "did not take any actions indicating an intent to turn her separate property over to the marital estate," no portion of the structure was marital property) (internal quotation marks and alterations omitted).

26. *See also, e.g., Blechman v. Blechman*, 234 A.D.2d 693, 650 N.Y.S.2d, 456, 457 (1996) (stating that separate property may also "los[e] its character as separate property, through commingling with marital funds"); *Johnson v. Johnson*, 650 So.2d 1281, 1286 (Miss.1994) ("[A]ssets which were commingled with the joint marital estate ... lost their non[-]marital character by commingling.").

27. *See also Allgood v. Allgood*, 62 So.3d 443, 447 (Miss.Ct.App.2011) ("Spouses possessing separate ownership convert the property into marital property through ... family use[.]");

Consideration of these cases leads us to conclude that where a spouse's separate property has been combined or blended with marital property in such a way that (1) the two items of property came to be used as one property[28] and (2) one or both properties would be destroyed or damaged or left with a gaping deficiency or defect if the properties were separated,[29] the *Darling* rule permits the trial court to treat the separate property as "transformed" and the combined or blended property as marital property that is subject to equitable distribution under § 16–910(b). And while our precedent does not permit us to conclude, as Mississippi courts have, that use of a real property owned by one spouse as the family home is generally enough by itself to convert the property to marital property (elsewise, we might have recognized that the property in *Yeldell* was marital property), the fact that a combined property has been used as the family home is a factor that the trial court may find weighs, in conjunction with the factors listed above, in favor of a conclusion that the separate property has lost its character as separate property and that the combined property is marital property. That is because (and we refer again to the "logic" underlying

§ 16–910(a)) the fact that a combined property has served as the spouses' and their child(ren)'s family home may give rise to "an objectively reasonable expectation of an interest in that property on the part of the other spouse." *Hemily,* 403 A.2d at 1142–43.

All of the foregoing factors are present in this case. The New Jersey Avenue property was acquired by the husband as his sole and separate property before the parties' marriage, but the house on the New Jersey Avenue property was annexed to the contiguous S Street house through creation of a passageway, enabling the family to use the two structures as a single dwelling. The family did so use it (as evidenced by the wife's testimony that the three children "are used to" the entire expanded home). In addition, the trial court credited the wife's testimony[30] that the S Street house was rebuilt without a kitchen—a defect that means it could not be used as a separate residence unless a room is converted to a kitchen. Absent such redesign and restructuring, the S Street structure's lack of a kitchen means that, for use as a residential structure, it is dependent on its connection to the New Jersey Avenue house.[31] On this record,

---

*Hankins v. Hankins,* 866 So.2d 508, 511 (Miss.Ct.App.2004) (holding that the spouses' "long-term family use of the property [acquired by the husband before marriage] converted the residential house and lot into marital property," but that the same could not be said of the chicken farm the husband acquired before marriage, because the wife had had "negligible involvement in its operation").

28. With respect to real property, such a combination or blending will likely require that the properties be connected or annexed or otherwise in close proximity to each other.

29. With respect to structures on real property, we envision this as meaning that the structures cannot be returned to use as individual

units without substantial damage or depreciation to, or substantial redesign or re-structuring of, one or both of the structures.

30. Although the husband asserted at oral argument before this court that the S Street property has a kitchen, the wife's testimony was not contradicted by any evidence at trial (including the testimony of the husband's appraiser, who explained to the court that he appraised the New Jersey Avenue and S Street properties without having seen the interior of either structure).

31. In a manner of speaking, because it has a kitchen, the New Jersey Avenue property is the servient portion of the expanded marital home—a situation analogous to a parcel of real property being servient to a second prop-

we have little trouble affirming the trial court's ruling that the two structures together were marital property that could be distributed pursuant to § 16–910(b).[32]

## V. Award of Attorney's Fees

In his Order, Judge Bayly directed the wife's counsel to "submit his request for attorney's fees and costs ... in connection with this case." Counsel complied, and on March 15, 2012, the court (the Honorable Jennifer Di Toro, who assumed responsibility for the case upon Judge Bayly's retirement) awarded the wife $80,540 in attorney's fees. The husband now raises a battery of claims of error, including that the trial court lacked jurisdiction and the statutory authority to award attorney's fees to the wife. We disagree.

▮ The husband's jurisdictional argument—which is that the trial court was "divested ... of jurisdiction" once he filed his notice of appeal on September 20, 2011—is easily disposed of at the outset. While "appellate jurisdiction ... divests a trial court of jurisdiction to hear matters relating to those issues [which have been raised] on appeal," the trial court "is free to decide 'other matters [such as a request

for attorney's fees] which do not result in revocation or alteration of the judgment on appeal.'" *In re Estate of Green*, 896 A.2d 250, 254, 254 n. 6 (D.C.2006) (quoting *Stebbins v. Stebbins*, 673 A.2d 184, 190 (D.C. 1996) ("[A] trial court may award attorney fees to a prevailing party even though the underlying order is on appeal.")).

The husband contends that the court erred as a matter of law in concluding that it was authorized to award the wife attorney's fees under D.C.Code § 16–911(a)(1) (2001), which provides that "[d]uring the pendency of an action for divorce, ... the court may: ... require the spouse ... to pay suit money, including counsel fees, to enable such other spouse to conduct the case." The husband asserts that by the time the fee award was made, the wife had successfully conducted her defense and pursued her claims, and trial had been over for more than a year. The attorney's fee award was unauthorized, the husband reasons, because it was not made "during the pendency of an action for divorce," [33] the wife was no longer his "spouse," and she no longer needed an award of counsel fees "to enable [her] to conduct the

---

erty because of an easement for the benefit of the second property. *Cf. Estate of Patterson v. Sharek*, 924 A.2d 1005, 1014 (D.C.2007).

**32.** We affirm the court's distribution of the properties, but we note that the rule we have articulated, which supports the trial court's conclusion that the property was subject to equitable distribution, did not dictate that the property be awarded to the wife. In determining how to distribute property that has lost its character as separate property, a trial court still must consider all the statutory factors. *See* D.C.Code § 16–910(b)(1)–(12). The trial court undertook that consideration here, and we conclude that its decision to award the New Jersey Avenue and S Street properties to the wife was not an abuse of discretion.

Sustaining the property distribution is an additional reason why we sustain the alimony

award, which the court premised on the amounts required each month to pay the mortgages on the properties while the wife trains to re-enter the workforce. While the husband asserts that the court lacked a factual foundation for the alimony award since the wife did not submit a financial statement, the court credited the wife's testimony that she had no assets, and it also could infer that she lacked the means to pay the mortgages since it was undisputed that she had not worked outside the home in a number of years.

**33.** This ignores the reality (demonstrated by the Superior Court docket sheet in this very case) that post-trial, and until a case is closed, a matter can remain very much pendent, with motions to supplement the trial record, hearings in aid of judgment, and the like.

case." [34]

■ "We generally review 'a trial court's decision to grant or deny a request for fees and costs' for abuse of discretion." *McClintic v. McClintic*, 39 A.3d 1274, 1277 (D.C.2012). However, where, as here, the issue is whether the trial court possessed the statutory authority to award particular fees and costs, our review is *de novo*. *Id.*

■ Although the husband relies on what he asserts is the plain meaning of the statutory language, his argument fails because it is short-sighted. We have no doubt that the possibility of the client's recovery of an attorney's fee award is what enables many a spouse to obtain legal representation in a divorce action. We need not speculate in order to conclude that if attorney's fee awards could not be made after trial—when the court can consider, as it must, factors such as the "quality and nature of the services performed" and "the results obtained from the services" [35]—the availability of counsel to divorcing spouses (including the wife here) who have no income or assets of their own would be severely limited. That is enough to enable us to conclude that the practice of making attorney's fee awards after trial, and after the divorce decree has been issued,[36] is consistent with the trial court's statutory authority to award fees "to enable such other spouse to conduct the case." [37]

■ We note that this case is readily distinguishable from *McClintic*. There, we reversed the court's post-divorce-de-

cree order awarding attorney's fees to Mr. McClintic because the trial court had failed to inquire into whether he had demonstrated a financial need, and because the record showed that he had "more than sufficient financial ability to maintain the divorce action and was thus able to conduct the case without suit money." 39 A.3d at 1281 (internal quotation marks omitted). Here, by contrast, although the husband asserts that the wife never showed a need for suit money, the undisputed evidence was that, during most of the marriage and at the time of divorce, the wife was unemployed, had no income, and had hospital and credit card debt that she was unable to pay.

■ We also discern no merit in the husband's challenge to the amount of the fee award. The fee award request was accompanied by counsel's description of time and work, and we see no indication that, as the husband asserts, the request and the corresponding award included amounts for time spent on the wife's criminal case or on litigation other than the instant divorce and custody action. The husband faults Judge Di Toro for referring to the contentiousness of the litigation and of actions by the husband (for example, the husband's snatching of some of the wife's documents relating to the case, which occasioned her emergency motion to compel him to return the documents) and contends that the attorney's fee award was punitive and based on improper factors. However, Judge Di Toro properly considered the "necessity for the [legal] services" [38] the

---

34. On the other hand—confusingly—the husband states in his Reply Brief that he "does not argue that a trial court cannot enter a suit money award after trial."

35. *Steadman v. Steadman*, 514 A.2d 1196, 1200 (D.C.1986).

36. Here, of course, Judge Bayly determined in his Order that a fee award was appropri-

ate. Judge Di Toro decided only the amount of the award.

37. The husband asserts his "reasonable belief" that the wife's counsel represented her *pro bono*, but we discern no basis in the record for that belief.

38. *Steadman*, 514 A.2d at 1200.

wife's counsel provided, and, citing *Rachal v. Rachal,* 489 A.2d 476, 478 (D.C.1985), she expressly understood that the motivation of the parties could play no role in her decision as to the amount of the fee award.[39] Properly, the fee award was based on "the actual services performed by the attorney," *id.,* and on an assessment of counsel's skill and experience, the reasonableness of his rates over 14 months of representation, the successful result obtained, the husband's financial ability to pay the award, and the wife's lack of financial ability to do so. We discern in the attorney's fee award to the wife no legal error and no abuse of the court's broad discretion.

## VI. Conclusion

For the foregoing reasons, the judgment of the trial court is

*Affirmed.*

---

**39.** For the same reason, Judge Di Toro properly did not consider matters that the husband's brief suggests were overlooked, such as the wife's misdemeanor conviction and what the husband alleges was her inappropriate resort to public assistance while the issues of child support and alimony remained pending.