*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 23-FM-0050

UZAY TURKER, APPELLANT,

v.

WITNEY E. WEAVER, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2019-DRB-000054)

(Hon. Deborah J. Israel, Trial Judge)

(Submitted April 10, 2024                    Decided August 29, 2024)

*Uzay Turker*, pro se.

*Alan Solomon*, for appellee.

Before HOWARD and SHANKER, *Associate Judges*, and WASHINGTON, *Senior Judge*.

HOWARD, *Associate Judge*: Appellant Uzay Turker challenges the trial court's physical custody award regarding the minor child, E.W.T., whom he shares with Appellee Witney Weaver. Mr. Turker, appearing pro se, argues that the trial court abused its discretion by disproportionately weighing his involvement in intrafamily offenses when reducing his custodial time with E.W.T. On review, we discern no

abuse of discretion. The trial court considered the factors set forth in D.C. Code § 16-914(a)(3) and weighed the evidence presented in the best interest of E.W.T. As a result, we affirm the trial court's final custody order.

## I.    Background

Mr. Turker and Ms. Weaver are the biological parents of E.W.T. Their relationship began in 2016 while Mr. Turker was still married to his former wife, who is the biological mother of his first child. Shortly after Mr. Turker's divorce in the summer of 2017, Ms. Weaver moved into Mr. Turker's residence in the District. The two lived together for the duration of Ms. Weaver's pregnancy and until E.W.T. was four months old. During this time, Ms. Weaver stayed at home to care for E.W.T. while Mr. Turker worked at a restaurant that he owned and paid for the household's expenses. At trial, Ms. Weaver testified that after E.W.T. was born, Mr. Turker continued to "party to excess" and often stayed out partying until the early morning hours.

The trial court found that throughout 2018 and 2019, both Mr. Turker and Ms. Weaver engaged in multiple instances of physical violence against one another—characterizing each as "demonstrat[ing] belligerent, harassing, and violent behaviors" toward the other. During trial, the court heard the testimony of witnesses about Mr. Turker's and Ms. Weaver's negative temperaments—especially toward

the other.  On at least one occasion, the trial court found that the violence occurred in front of E.W.T.  One of the earliest instances of violence occurred in June 2018, which resulted in Ms. Weaver and E.W.T. moving to Garrett County, Maryland, with Ms. Weaver's stepfather.  During that instance, Mr. Turker prevented Ms. Weaver from leaving their shared residence in the District by physically blocking her exit and withholding her belongings.  Ms. Weaver eventually called her mother, Nan Weaver, who facilitated Ms. Weaver and E.W.T.'s safe exit from the residence.  Mr. Turker and Ms. Weaver later reconciled but continued their cycle of behavior; Ms. Weaver, ultimately, returned to Garrett County.

In January 2019, Mr. Turker filed a complaint seeking joint physical custody of E.W.T.  One month later, the trial court issued a Temporary Custody Order ("TCO") by Consent in which Mr. Turker and Ms. Weaver agreed that Mr. Turker would have custody of E.W.T. from Sunday morning until Tuesday evening, and Ms. Weaver would have custody at all other times.  In October 2020, the trial court issued a Temporary Custody and Visitation Order ("TCVO"), which supplemented the TCO, established custody for the winter holidays, and required court permission before either party engaged in international travel with E.W.T.

Unfortunately, the TCO did not ease tensions between Mr. Turker and Ms. Weaver.  During the first year of exchanges, Ms. Weaver would spend thirty to

forty minutes inspecting the car seat installed in Mr. Turker's vehicle, which Mr. Turker "found unreasonable." Ms. Weaver justified these inspections by recalling "with great specificity" several instances where Mr. Turker had the car seat installed in the front seat, facing the wrong direction, or without the rear tether. The trial court heard from two non-party witnesses who each testified to instances where they observed the car seat installed improperly in Mr. Turker's vehicle.[1] The trial court also credited Ms. Weaver's testimony about "several illegal driving tactics [Mr. Turker] employ[ed]."

While the TCVO touched on only international travel, domestic travel proved to be contentious for Mr. Turker and Ms. Weaver as well. On two occasions in June 2021, Mr. Turker took E.W.T. to his second residence in Florida without notifying Ms. Weaver. After each of these incidents, Ms. Weaver filed a Motion for Contempt of Temporary Custody because these out-of-state visits encroached on her time with E.W.T., pursuant to the TCO.[2] Ms. Weaver then "withheld [E.W.T.] from

---

[1] Nan Weaver testified that she observed Mr. Turker, "while seated in the driver's seat of his vehicle[,] remove [E.W.T]'s car seat from the back of the car and hand it . . . through the driver's seat window." In addition, MaryKay Canarte, a friend and former romantic partner of Mr. Turker, testified that "she observed [E.W.T.'s] car seat improperly installed within [Mr. Turker's] convertible."

[2] Ms. Weaver filed the first Motion for Contempt of Temporary Custody on June 11, 2021, and a second motion on June 22, 2021.

[Mr. Turker] from June to November 2021" for fear of Mr. Turker "abscond[ing] with [E.W.T.]." During that period, Mr. Turker filed several Motions for Contempt.

Shortly before these instances of Mr. Turker removing E.W.T. from the District, in May 2021, Mr. Turker appeared at E.W.T.'s school "unannounced and unidentified." The owner of the school refused to answer any questions concerning E.W.T. because Mr. Turker was unknown to her and not listed on E.W.T.'s emergency contact list. Mr. Turker sought to persuade her of his relation to E.W.T. by showing her photos of him with E.W.T. and she called the police when he refused to leave. Mr. Turker responded by moving his vehicle just "outside the boundaries of the campus property" where he "proceeded to interact with the enrolled children and their respective parents, who were entering and exiting the school, asking about [E.W.T.]." Mr. Turker again returned to the entrance of the school and began tapping on the windows, which resulted in a "soft-lock down" of the school. Mr. Turker did not leave until the police arrived and asked him to do so. The trial court found that Mr. Turker "demonstrated absolutely no appreciation" for the seriousness of his actions and the disruption to the school day because in testifying about the incident Mr. Turker "did not impute . . . any real significance" to the incident.

In addition to conflict surrounding the custody agreement, the trial court found that Mr. Turker's and Ms. Weaver's disagreement spanned "most medical decisions concerning [E.W.T.]."[3] The topics of disagreement ranged from selecting medical insurance and a doctor for E.W.T. to coordinating schedules such that both parents could attend medical appointments. During one such instance, Mr. Turker and Ms. Weaver agreed to continue with Mr. Turker's scheduled visitation even though E.W.T. had a fever. When the child returned to her care, Ms. Weaver took E.W.T. to the emergency room where the child was diagnosed with pneumonia. After the diagnosis, Mr. Turker refused to administer the prescribed medication. As a result of the incident, the trial court determined that "[Mr. Turker] failed to take proper medical care of [E.W.T.] . . . and . . . neither communicated truthfully about [E.W.T.]'s condition nor obtained the necessary medical attention on [E.W.T.'s] behalf."

During the four-day trial, the trial court also heard from several witnesses who spoke positively about the relationship each parent shares with E.W.T. Ms. Canarte testified that E.W.T. "looks to [Mr. Turker] for security" and that they share a close relationship with one another. Nan Weaver testified that "[Ms. Weaver] is an active

---

[3] The trial court noted that Ms. Weaver takes on the primary responsibility of coordinating E.W.T.'s medical appointments.

mother" and that she "tries to impart appropriate responsibility to [E.W.T.] as [they] age[], such as by allowing [E.W.T.] to dress [themselves] and to feed the cat." The trial court found that Mr. Turker and Ms. Weaver both "harbor a genuine desire to be an active part of [E.W.T.]'s life."

On December 27, 2022, the trial court issued a Permanent Custody and Child Support Order awarding sole legal custody to Ms. Weaver and joint physical custody to Ms. Weaver and Mr. Turker. Under the joint physical custody order, E.W.T. is to primarily reside with Ms. Weaver, and be in the care of Mr. Turker every other weekend beginning on Friday evenings after school until Sunday afternoon. In addition, Mr. Turker was awarded two weeks of uninterrupted time during the summer with E.W.T. The court fixed a location for exchanges of E.W.T. outside of a Metropolitan Police Department station to "'lessen the opportunity' for either [Mr. Turker or Ms. Weaver] to resort to violence."

In its order, the trial court addressed the credibility of Mr. Turker and Ms. Weaver. The trial court explained that Mr. Turker and Ms. Weaver each "displayed an emotional immaturity that ma[de] it difficult for the [trial c]ourt to test their sincerity." Accordingly, the trial court "made certain findings of fact where [Mr. Turker and Ms. Weaver's] testimony align[] and then addressed material differences when the testimony did not align." However, the trial court "in some

instances" deferred to Ms. Weaver's testimony because the court found Mr. Turker "lacking in credibility and candor in certain critical areas."[4]

In fashioning the custody award, the trial court considered the best interest of the child and all relevant factors as outlined in D.C. Code § 16-914. Foremost, the trial court determined that the presumption of joint custody was rebutted in this case because it "found by a preponderance of the evidence that [Mr. Turker and Ms. Weaver] committed intrafamily offenses against each other (specifically in a

---

[4] The trial court detailed Mr. Turker's pattern of falsifying or otherwise concealing his true financial position. First, the court explained that during the COVID-19 pandemic, Mr. Turker filed a motion seeking to temporarily cease his child support obligation as a result of his restaurant business being closed in response to the public health emergency. However, that same year, Mr. Turker received a loan from the Small Business Administration ("SBA") for his business. Mr. Turker provided no supporting or corroborating evidence as to the amount of the loan.

However, from the documents that the trial court did have access to, it understood Mr. Turker to have "relative financial security" at the time he sought to modify his child support obligation. Those financial documents revealed that in the month following his motion to modify child support, Mr. Turker received an electronic wire transfer for $25,000 and made a cash disbursement of $105,000. During that same year, Mr. Turker purchased $1,809,354 and sold $1,767,954 in securities.

The trial court also noted that Mr. Turker received a second loan from the SBA, which he testified was in the amount of $138,000, but documentary evidence showed it was actually in the amount of $212,767. The court further opined that Mr. Turker misrepresented his ownership interest in another business, which contributed to a pattern of Mr. Turker's "habitual capacity to lie in order [to] achieve certain financial ends."

series of incidents in 2018 and 2019)." The trial court explicitly noted that it "ha[d] insufficient evidence and [could not] identify within any particular incident a single aggressor or attribute sole responsibility to either Party," and therefore was "less able to conduct a 'separate evaluation' of each Party's offenses." The trial court characterized these instances of violence as "inextricably intertwined," but nevertheless did not "simply cancel[] each other out."

In further assessing the relevant factors for a determination of the best interest of the child, the trial court determined that both parents "harbor a genuine desire to be an active part of [E.W.T.]'s life." Nonetheless, the trial court determined it was in the best interest of E.W.T. for Ms. Weaver to have sole legal custody because of Mr. Turker's "repeated lack of sound judg[]ment . . . and . . . the risk of future harm it poses to [E.W.T.]" such that "[Mr. Turker] acts with his own needs and wants top of mind, not with [E.W.T.] as a priority." The trial court outlined four bases for this conclusion: (1) Mr. Turker's excessive partying into the early morning hours; (2) Mr. Turker's failure to seek proper medical care for E.W.T. when the child contracted pneumonia; (3) Mr. Turker's behavior at E.W.T.'s school that resulted in the police being called and the school being placed in a soft lockdown; and (4) Mr. Turker's "unsafe and irresponsible driving habits (including his unwillingness to properly fasten [E.W.T.]'s car seat)." The trial court further

explained that E.W.T. was "well adjusted" to the school they attend in Maryland and that it wished to avoid disrupting E.W.T.'s adjustment to that environment.

Relying on our precedent, *Araya v. Keleta*, 65 A.3d 40 (D.C. 2013), the trial court explained that it sought to fashion a physical custody arrangement that would "'lessen the opportunity' for the aggressive party to 'turn to violence.'" The trial court found that both parents would "benefit from a shared physical custody arrangement in which they both spend significant time with [E.W.T.] and are able to develop their individual relationship with [them]." Therefore, it awarded joint physical custody, reduced Mr. Turker's custodial time with E.W.T., and required that Ms. Weaver be responsible for E.W.T.'s transportation to and from visitation with such exchanges at a police station. Mr. Turker appealed.

## II. Standard of Review

This court reviews a trial court's award of child custody for an abuse of discretion. *Hutchins v. Compton*, 917 A.2d 680, 683 (D.C. 2007). We review legal determinations de novo and apply a clearly erroneous standard to factual findings. *Jordan v. Jordan*, 14 A.3d 1136, 1146 (D.C. 2011). In assessing whether the trial court abused its discretion, "this court looks to whether the trial judge has considered all relevant factors and no improper ones, and to whether [the] decision is then

supported by substantial reasoning drawn from a firm factual foundation in the record." *See Prost v. Greene*, 652 A.2d 621, 626 (D.C. 1995).

### III.    Discussion

Mr. Turker argues that the trial court abused its discretion by ascribing disproportionate weight to his involvement in intrafamily offenses when awarding custody of E.W.T. and by conducting an improper analysis under *Araya.*  He asks this court to modify the trial court's order to increase his visitation time with E.W.T. We disagree, and find that the trial court properly awarded custody after considering all of the relevant D.C. Code § 16-914(a)(3) factors.

In child custody cases, "the best interest of the child shall be the primary consideration."   *See* D.C. Code § 16-914.   The code requires the trial court to "consider all relevant factors," including a list of seventeen factors.  *See* D.C. Code § 16-914(a)(3); *A.C. v. N.W.*, 160 A.3d 509, 519-20 (D.C. 2017) (citing *Dumas v. Woods*, 914 A.2d 676, 679 (D.C. 2007)).

D.C. Code § 16-914(a)(2) provides a "rebuttable presumption that joint custody is in the best interest of the child," unless an intrafamily offense or several other listed types of violations are found by a preponderance of the evidence.  *See Dumas*, 914 A.2d at 678-79.  Where an applicable violation is found, a rebuttable

presumption arises that joint custody is not in the best interest of the child. D.C. Code § 16-914(a)(2). Where one seeking custody has been found to be the primary aggressor in an intrafamily offense, the court may nevertheless award visitation if the court "finds that the child and custodial parent can be adequately protected from harm inflicted by the other." D.C. Code § 16-914(a-1). Additionally, the party that has "committed an intrafamily offense has the burden of proving that visitation will not endanger the child or significantly impair the child's emotional development." *Id.*

Mr. Turker does not argue that the trial court somehow erred in its finding that intrafamily violence had taken place; quite the opposite, he acknowledges that both he and Ms. Weaver had a part to play in the violence between them. However, Mr. Turker perceives our precedent in *Araya* as implicating or creating a procedure that, when both parties are found to have committed intrafamily offenses, the trial court is required to separately evaluate each party's offenses, weigh them against the other, and ascribe individual responsibility to each to determine whether the presumption of joint custody is rebutted. In this case, the trial court explicitly noted that it "ha[d] insufficient evidence and [could not] identify within any particular incident a single aggressor or attribute sole responsibility to either Party," and therefore was "less able to conduct a 'separate evaluation' of each Party's offenses." Ultimately, it characterized Mr. Turker and Ms. Weaver's instances of violence as

"inextricably intertwined," but not canceling each other out. As a result, Mr. Turker asserts that because the trial court could not separately analyze the instances of violence, it could not rebut the presumption of joint custody. This is a misunderstanding of our precedent and the code.

At the outset of *Araya* we did not deem the custody determination analysis to merit an opinion, only the property division; therefore, it cannot be said that we set about to create a new precedential procedure or further explain uncertainty in the law of custody in the first instance. 65 A.3d at 43. Per its own terms, the code is explicit that when an intrafamily offense is found, the rebuttable presumption of joint custody no longer applies. D.C. Code § 16-914(a)(2). The number of potential custodial parties who can be responsible for intrafamily offenses does not change that—nor does it negate the finding of an intrafamily offense. At the point that the trial court finds intrafamily offenses perpetrated by one or more potential custodians, the trial court must conduct its best interest analysis with a presumption that joint custody is not in the best interest of the child. *See id.*

Where each party seeking custody is responsible for an intrafamily offense, the presumption against joint custody does not favor either party and the trial court is tasked with fashioning a custodial arrangement that is in the best interest of the child and adequately protects against risks of harm inflicted through intrafamily violence. *See* D.C. Code § 16-914(a-1); *Araya*, 65 A.3d at 45; *see also P.F. v. N.C.*,

953 A.2d 1107, 1114-15 (D.C. 2008) (explaining the legislative history of Section 16-914(a-1)). Without reproducing it at length, that is exactly what happened in *Araya*. *See* 65 A.3d at 43-47. And it is exactly what happened here.

Mr. Turker does not challenge whether the trial court conducted a full analysis of the best-interest factors and our review leaves us satisfied that it did. With both parties responsible for intrafamily offenses, the trial court carefully looked at what it could determine of the relational conflict between Mr. Turker and Ms. Weaver, acknowledged that it was the result of both parties, and sought to put procedures in place to minimize risks of future violence.

Mr. Turker's only additional challenge is that the trial court "improperly" based its "[limited] custody award to Mr. [Turker] . . . on speculation that Mr. [Turker] might be violent toward the child." Again, we see no merit in this argument. The trial court made explicit findings "that none of the violence was ever directed at [E.W.T.]." The trial court's decision appears to be primarily based on its concern that Mr. Turker is unable to effectively care for E.W.T. and put their needs above his own desires.

On this record, we discern no abuse of discretion.

## IV. Conclusion

For the foregoing reasons, the order of the Superior Court is affirmed.

*So ordered.*